Curtis L. IRICK, Appellant,

v.

UNITED STATES, Appellee.

Larry DANIELS, Appellant,

v.

UNITED STATES, Appellee.

Jerry L. DANIELS, Appellant,

v.

UNITED STATES, Appellee.

Nos. 87–134, 87–429 and 87–592.

District of Columbia Court of Appeals.

Argued Nov. 10, 1988.
Decided Oct. 5, 1989.

Calvin Steinmetz, appointed by this court, for appellant, Curtis L. Irick.

Joanne D. Slaight, appointed by this court, for appellant, Larry Daniels.

Thomas B. Mason, Public Defender Service, with whom James Klein, and Jennifer P. Lyman, Public Defender Service, were on the brief, for appellant, Jerry L. Daniels.

Ann K.H. Simon, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty. at the time the brief was filed, were on the brief, for appellee.

Before NEWMAN, BELSON and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

## I

## THE CASE

These consolidated appeals arise out of the shooting and wounding of an undercover police officer who was investigating illicit drug activity and attempting to make an arrest. Following a five-week jury trial, the appellants Larry Daniels (L.D.), his brother Jerry Daniels (J.D.)[1] and Curtis Irick were all convicted of possession of cocaine with intent to distribute it (PWID), in violation of D.C.Code § 33-541(a)(1) (1988). J.D. and Irick were also convicted of assault on a police officer while armed, § 22-505(a) and (b), and of carrying a pistol without a license, § 22-3204. All three appellants were sentenced to serve mandatory minimum prison terms for PWID, and J.D. and Irick received substantial additional periods of incarceration on the assault and weapons counts.

On appeal, L.D. claims that the evidence against him was insufficient to support his conviction. J.D. contends that the trial judge abused his discretion by improperly admitting certain testimony by the prosecution's expert witness. Both Irick and J.D. seek reversal of their convictions on the grounds of alleged prosecutorial misconduct.

With respect to L.D.'s appeal, we hold that the evidence against him, when viewed as it must be in the light most favorable to the government, was sufficient to support his conviction. We also discern no abuse of discretion in the trial judge's admission of the expert testimony challenged by J.D.

The issue of prosecutorial misconduct is more difficult. We agree with Irick and J.D. that on some occasions the conduct of the prosecutor, who apparently threatened outside the courtroom to "bust [J.D.'s counsel] in the mouth," was less than a model of decorum. A few comments made by the prosecutor during the trial were plainly inappropriate, and a number of others were close to the line and, from the calm and detached perspective of appellate review, might better have been left unsaid. Some of what the prosecutor did was triggered but, we emphasize, not excused, by some troubling tactics by J.D.'s counsel. On balance, we cannot agree with J.D. and

1. The use of initials for the Daniels brothers appears to us to be the easiest way to differentiate between them as we recount their respective roles in the events which have resulted in this opinion.

Irick that the prosecutor's conduct was "unprovoked" or "egregious." Indeed, we note that much (though not all) of the alleged misconduct passed without objection by any of the three defense attorneys and is challenged for the first time on appeal. Appellants were not entitled to a perfect trial, and we are satisfied that they received a fair one. Accordingly, we affirm their convictions.

## II

## THE FACTS[2]

### A. *The prosecution case*

The prosecution introduced evidence tending to show that on January 9, 1986, Officers Jimmie Lewis and Byron Wallace were in casual clothes, assigned to enforcement of the drug laws. Between 6:15 and 6:30 p.m., they monitored a broadcast for subjects selling drugs at a nearby playground. They drove to the area, and eventually saw a group of men near the door to a school building. The officers walked in the direction of the group, and Wallace inquired if "anybody got halves [of cocaine]." A man later identified as L.D. approached the officers. He said that he had halves for fifty dollars and asked for the money. Officer Wallace, however, had seen a man later identified as J.D. some 25 to 30 feet away actually delivering drugs. He told L.D. that he would go straight to the man with the dope. The officers walked towards J.D.

J.D., with his hand still in a pouch apparently filled with the cocaine which he was selling, asked Officer Wallace "what do you need?" Wallace identified himself as a police officer and told J.D. that he was under arrest. J.D. offered no resistance and sat on the ground. Officer Lewis prepared to call for a transportation unit over the police radio, but there was "chatter" on the channel which he intended to use.

As Officer Lewis was waiting for the channel to clear, a tall man, later identified as Irick, approached the group, carrying a large handgun. Wallace told Irick that he and Lewis were police officers. J.D. still seated on the ground, told Irick: "Get them, Boo [or Butch].... Don't let them get me. Shoot them. Don't let them take me," or words to that effect. Lewis began to reach for his service revolver. Irick pointed his weapon at Lewis and fired from a distance of five feet. The bullet struck Lewis' thumb and body, missed vital organs in his abdomen, and exited some three millimeters from his spine. Irick and J.D. fled. Officer Wallace gave chase, and he and Officer Lewis both fired shots in the fugitives' direction. Wallace then returned to obtain assistance for his wounded colleague. A civilian witness testified that he saw two men running from the scene, and that he heard one of them say that he had "got that motherfucker."

More police officers came to the scene. They found a Wendy's bag with a warm hamburger, as well as three packets of cocaine, at the location where J.D. had been standing. J.D.'s fingerprints were on the Wendy's bag.

Shortly after the shooting, Officer William Herndon responded to the area. He saw L.D. jump over a fence and walk away at a rapid pace. L.D.'s clothing matched the description of that worn by one of the drug sellers in the original radio lookout. Officer Herndon ordered L.D. to stop. L.D. volunteered, for no readily apparent reason, that he had just got out of a cab. No cab was in sight.

Cassandra Dorsey, a long term heroin and cocaine addict who was facing possible revocation of her probation, also testified for the prosecution. At the time of the offenses, she was living with her boyfriend Tommy Daniels, a brother of J.D. and L.D., and with the Daniels brothers' mother. She testified that J.D., Irick and a third man arrived at the house between 6 and 7 p.m. on the day of the shooting. The men talked about having shot a police officer, and Irick suggested that they had better get out of town. Irick gave a large gun to J.D., who passed it on to his brother Tom-

2. The evidence in this lengthy trial was extensive and at times complex. We outline only so much of it as is necessary to comprehend this opinion.

my with directions to bury it. Based on information received from Ms. Dorsey and Tommy Daniels, police eventually recovered the hand gun under a van behind the garage near the Daniels' home. The bullet that passed through Officer Lewis was positively identified as having come from this handgun.

Detective Johnny St. Valentine Brown testified as an expert witness for the government, primarily on the subject of the *modus operandi* of drug dealers. He related, among other things, that more sophisticated drug distribution units may include a "lieutenant" or "enforcer." This individual's job is to be on the scene of the distribution activity, armed with a weapon, to protect the individuals engaged in the sale of the drugs from "stick-up boys" and police.[3] He testified that if individuals who are close to each other in the same location are distributing drugs, they are likely to be part of the same organization.

B. *The defense case*

L.D.'s defense was a general denial, and he called no witnesses. J.D. likewise did not testify. Through counsel, he admitted his guilt of the PWID charge, but vigorously contested the assault and weapons charges. In doing so, he relied on the evidence presented by his codefendant Irick.

Irick testified in substance that he had come to the playground to buy cocaine from J.D., whom he knew only slightly, having purchased drugs from him on a previous occasion at a different location. He denied being associated in any drug selling operation with J.D. or anyone else. On his way to make the purchase, he picked up a .44 caliber handgun at his father's garage for the purpose of taking it to his mother's home. Upon his arrival at the playground, he gave J.D. $45.00, and J.D. asked him to wait a few minutes so that he could procure a "half" of cocaine for him.

While he was awaiting the arrival of the cocaine, he witnessed two men apparently attempting to rob J.D. at gunpoint. Concerned because J.D. had his $45.00, Irick pulled out his weapon and ordered one of the men—who later turned out to be Officer Wallace—to drop his gun and raise his hands. The other man who, unbeknownst to Irick, was Officer Lewis, began to pull out his revolver and appeared to be about to shoot Irick. Irick then shot Lewis in the hand. After some further shooting, Irick and J.D. fled. Irick went to J.D.'s house because J.D. had his money. Neither of the two apparent robbers announced that he was a police officer,[4] and Irick only learned of his victim's identity from J.D.'s brother Tommy, who had heard it on a television news report.[5]

III

L.D.'S APPEAL

L.D. contends that the evidence was insufficient to establish beyond a reasonable doubt that he aided and abetted the possession of cocaine with intent to distribute it.[6] Although the case against him was perhaps less than overwhelming, we cannot

3. Over the prosecutor's objection, the trial judge granted a defense motion to strike testimony by Detective Brown to the effect that the other members of a distribution unit would know of the presence of the enforcer. At the close of the government case, and consistently with this ruling, the judge granted defense motions for judgment of acquittal of conspiracy charges against the three appellants, reasoning that there was no proof beyond a reasonable doubt of an agreement between them.

4. J.D. and Irick attempted to bolster their defense that the two apparent robbers never identified themselves as police officers by their cross-examination of civilian witnesses who never heard such identification and by prior statements by Officer Lewis in which he did not claim that he had so identified himself.

5. Irick's girl friend, Deborah Williams, testified as to his whereabouts prior to the commission of the crime and confirmed that he stated he was going out to buy cocaine. She admitted on the witness stand that she had lied to the grand jury and to the petit jury, and the trial judge remarked that her credibility had been annihilated.

6. The trial judge granted L.D.'s motion for judgment of acquittal on all of the other charges against him.

agree that it was inadequate to support the jury's verdict.

In evaluating a claim of insufficiency, we must consider the evidence in the light most favorable to the government, giving the prosecutor the benefit of all reasonable inferences from the evidence. *Patterson v. United States,* 479 A.2d 335, 337–38 (D.C. 1984). Neither this court nor the trial court may usurp the jury's prerogative of determining credibility, weighing the evidence, and drawing reasonable inferences. *Stack v. United States,* 519 A.2d 147, 159–60 (D.C.1986).

The evidence against L.D., all of which was uncontradicted, included the following:

(1) L.D. offered to sell cocaine to the officers;

(2) his brother, J.D., with whom the jury could reasonably presume that he was acquainted, was 25 to 30 feet away, selling cocaine out of a pouch;

(3) Detective Brown testified that street distribution units of illicit drugs often contain a "runner" or "juggler" who advertises the product for sale, and that individuals who sell drugs in close proximity to one another are ordinarily part of the same unit;

(4) L.D. climbed a fence to make a moderately hurried [7] exit and lied to the police [8] about where he had been.

L.D. argues on appeal that brothers cannot be presumed to act in concert, noting among other examples of "sibling rivalry" that Cain slew Abel and subsequently denied knowledge of the offense and that Billy the Kid's brother "set him up for his death." We agree that guilt by association is a very dangerous principle, and that inferring culpability from an accused's blood relationship to a wrongdoer is likewise fraught with peril.[9]

In the present case, however, L.D. in effect asks us to rule as a matter of law that it must have been a coincidence [10] that L.D. was advertising the very drug which his brother was selling 25 to 30 feet away, and that the jury could not legitimately infer collaboration between them beyond a reasonable doubt. Coincidences do happen but, especially in the light of Detective Brown's testimony, the jury was not required to believe it to be fortuitous that the two brothers were engaged in the activities disclosed in this record at the same time and in almost the same place.

L.D. argues that, as Detective Brown acknowledged, people who purport to negotiate drug deals often have no intention of selling drugs, but are merely out to steal the would-be purchaser's money. Moreover, it is conceivable that L.D., if he did propose to provide cocaine to the officers, might have secured it from someone other than his brother. These hypotheses, while not exactly complimentary to L.D., are consistent with innocence of this particular charge.

It is well settled, however, that the government's evidence may be sufficient to survive a motion for judgment of acquittal even if it does not exclude every reasonable hypothesis other than guilt. *Holland v. United States,* 348 U.S. 121, 139–40, 75

7. At a fast walk. We conclude that little or no weight should be given to L.D.'s "flight" under these particular circumstances.

8. *See* 2 WIGMORE ON EVIDENCE § 278(2) at 133 (Chadbourn rev. ed. 1979); *Fox v. United States,* 421 A.2d 9 (D.C.1980). "False exculpatory statements made to law enforcement officers constitute independent circumstantial evidence of guilty consciousness." *Commonwealth v. Glass,* 486 Pa. 334, 346–47, 405 A.2d 1236, 1242 (1979).

9. Our dissenting colleague takes us to task for condemning guilt by association in principle but, in his view, countenancing it in practice. We think our deeds conform to our words.

It is undisputed that L.D. offered to sell an officer cocaine, and proof that he did so was altogether independent of the blood relationship between him and J.D. That relationship is relevant only to the question whether the hawking of cocaine by L.D. and its sale by J.D., when the two men were twenty-five feet apart and far from home, were part of the same operation. We do not think that our recognition in that context of the relevance of the two men's siblinghood (to the question whether there were two drug operations or only one) impairs anyone's constitutionally protected associational rights.

10. Or, more precisely, that the jury could not find beyond a reasonable doubt that it was no coincidence.

S.Ct. 127, 137–38, 99 L.Ed. 150 (1954); *Chaconas v. United States,* 326 A.2d 792, 798 (D.C.1974). The evidence, in other words, need not *compel* a finding of guilt beyond a reasonable doubt. *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987) (emphasis added). In the present case, the jury was not required, in order to convict L.D., to "cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation." *Id.* Accordingly, L.D.'s conviction must be affirmed.[11]

## IV

## THE EXPERT TESTIMONY

Over defense objection, the trial judge permitted Detective Brown to testify with respect to the role of an "enforcer" in a drug organization. As previously noted, the judge struck Brown's testimony that other members of the distribution unit would be aware of the enforcer's presence. We hold that the judge exercised his discretion judiciously and that there was no error.

J.D. contends that the evidence was improperly admitted because the question whether he and Irick were working in concert was well within the "ken" of lay jurors, and thus not an appropriate subject of expert testimony. *Cf. Dyas v. United States,* 376 A.2d 827, 832 (D.C.), *cert. denied,* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977). In our view, however, jurors unfamiliar with illicit drug operations could be aided in their search for the truth by expert testimony which casts some light on the kind of relationship that is likely to exist, on the streets of this city, between a drug seller who has been placed under arrest and a gunman who comes to his assistance. Although the average reader of the daily press might well surmise, to quote Detective Brown, that "when you relate to drugs and guns it's like a marriage," it was surely reasonable for the trial judge to conclude that an expert's explication of the background of this melancholy proposition would be helpful to the jury.

"The trial court has broad discretion to admit or exclude expert testimony, and its decision either way will not be disturbed on appeal unless it is manifestly erroneous." *Hinnant v. United States,* 520 A.2d 292, 293 (D.C.1987). Since the *modus operandi* of drug traffickers is not within the ken of the average lay person, expert testimony on the subject may be admitted if relevant. *Id.*[12] We think *Hinnant* controls this case, and find no abuse of discretion. *Accord, United States v. Dunn,* 269 U.S.App.D.C. 373, 375, 846 F.2d 761, 763 (1988); *see also United States v. Resto,* 824 F.2d 210, 212 (2d Cir.1987) (testimony as to role of a "steerer," apparently the New York equivalent of a "runner" or "juggler").

## V

## ALLEGED PROSECUTORIAL MISCONDUCT

J.D. and Irick claim that each was denied a fair trial as a result of prosecutorial misconduct. They contend primarily that the prosecutor attacked the integrity of defense counsel, expressed his personal opinion as to the veracity of witnesses, argued facts not in evidence, and depicted appellants as members of a sinister drug organization. The government denies that the prosecutor's actions constituted misconduct, noting that there was no objection in the trial court to much of the conduct challenged on appeal, and arguing that in general the prosecutor responded temperately to alleged improprieties by J.D.'s counsel.

11. L.D. has not claimed that he was denied a fair trial as a result of prosecutorial misconduct, and we therefore do not directly address our dissenting colleague's assertion as to prejudicial spillover. Our affirmance of the convictions of Irick and J.D. makes the issue academic in any event.

12. In *Hinnant,* the expert witness testified, among other things, that a person with a large sum of money, together with a quantity of pure heroin and "one street bag that is ready to go," is likely to be "selling dope." He further testified that a drug seller in such circumstances would be likely to carry a gun to avoid being robbed. This court sustained the admission of this evidence, rejecting the contention that it usurped the jury's prerogative or addressed the "ultimate issue." *Id.* at 294 n. 2.

In the alternative, the government contends that even if this court were to find that improprieties occurred, the convictions should not be reversed in light of the strength of the government's case. We agree that, taking the record as a whole, reversal is not appropriate.

A. *The legal standard*

In evaluating appellants' contentions, we must first determine whether the prosecutor's comments constituted misconduct. *Hammill v. United States*, 498 A.2d 551, 554 (D.C.1985); *Sherrod v. United States*, 478 A.2d 644, 655 (D.C.1984). If misconduct has occurred, then, viewing the comments in context, we must consider the gravity of the misconduct, its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case. *Hammill, supra*, 498 A.2d at 554. Where a defendant has properly preserved his objections, the court must determine

> whether we can say with fair assurance, after all that has happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.

*(Philip) Dyson v. United States*, 418 A.2d 127, 132 (D.C.1980); *Hammill, supra*, 498 A.2d at 554. Where the defendant failed to object, on the other hand,[13] we will reverse his conviction only if the misconduct so clearly prejudiced his substantial rights as to jeopardize the fairness and integrity of his trial. *Sherrod, supra*, 478 A.2d at 655; *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) *(en banc)*. The Supreme Court has cautioned that reversal for plain error in cases of alleged prosecutorial misconduct should be confined to "particularly egregious" situations. *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985).

We must also be cognizant of the fact that perfection is a rare commodity, that mistakes and misjudgments are likely to occur during long and hotly contested litigation, and that if every conviction following an imperfect trial were set aside, a judicial process run by mere mortals would soon run aground. The Supreme Court warned in *Young* that a criminal conviction "is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements must be viewed in context." *Id.* at 11, 105 S.Ct. at 1044.[14]

■ We must also bear in mind that our assessment of the dynamics of a trial is limited to what can be discerned from a cold record. As this court recognized in *Smith v. United States*, 315 A.2d 163, 167 (D.C.), *cert. denied*, 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974):

> It is peculiarly within the knowledge of the trial judge whether remarks of counsel during the trial tend to prejudice the cause of a party. The courtroom atmosphere, prior remarks which have provoked the questioned statements, and other factors which cannot be appraised by a reviewing court may render remarks of counsel innocuous, although they may appear viciously prejudicial when removed from their setting.[15]

*See also Sherrod, supra*, 478 A.2d at 658 n. 17; *Sherer v. United States*, 470 A.2d 732, 743 (D.C.1983), *cert. denied*, 469 U.S. 931, 105 S.Ct. 325, 83 L.Ed.2d 262 (1984) (court attached "considerable significance"

13. For purposes of determining whether a defendant has preserved his rights, we have held that a motion for a mistrial at the end of the prosecutor's initial closing argument is timely, for a contrary rule would encourage disruptive interruptions of the prosecutor's closing. *Hawthorne v. United States*, 476 A.2d 164, 169–70 (D.C.1984); *Powell v. United States*, 455 A.2d 405, 408 n. 1 (D.C.1982).

14. The Court also quoted from *Johnson v. United States*, 318 U.S. 189, 202, 63 S.Ct. 549, 555–56, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring), as follows:

> In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution.

470 U.S. at 16, 105 S.Ct. at 1047.

15. This court was quoting from *United States v. Goodman*, 110 F.2d 390, 394 (7th Cir.1940).

to trial judge's denial of mistrial following "heated" and improper arguments of attorneys).

Finally, we emphasize that although appellants' complaint is primarily with the prosecutor, it is our function to review the record for legal error or abuse of discretion by the trial judge, not by counsel. Such error or abuse may, to be sure, embrace not only incorrect rulings but also, on occasion, failure to intervene *sua sponte* when such intervention is called for, *United States v. Jenkins,* 140 U.S.App.D.C. 392, 397, 436 F.2d 140, 145 (1970), or to react with sufficient promptness and vigor to prosecutorial misdeeds. *King v. United States,* 125 U.S.App.D.C. 318, 330–31, 372 F.2d 383, 395–96 (1967). Nevertheless, absent some improper ruling or omission by the trial judge, we cannot ordinarily[16] reverse a conviction, and our ultimate focus must therefore be on what the judge did or failed to do.

With these principles in mind, we address appellants' principal contentions in turn.

B. *"Attacking the integrity of defense counsel"*

During his cross-examination of Cassandra Dorsey, J.D.'s counsel inquired, in the presence of the jury, whether the prosecutor had threatened her with imprisonment in order to secure from her testimony favorable to the government. Although Ms. Dorsey responded firmly in the negative,[17] and no contrary evidence was adduced, the prosecutor took personal offense, and it was this incident that triggered his apparent threat (in the courthouse but outside the presence of the jury) to bust his astonished adversary in the mouth. The trial judge denounced the questioning as "absolutely scurrilous" and "outrageous," and criticized J.D.'s counsel for slandering "one of the most highly ethical Assistant United States Attorneys" the judge had ever dealt with. Although the judge later tempered his criticism of the defense attorney,[18] there can be little doubt that the tensions generated by the incident affected the future course of the trial.

Early in his rebuttal argument, the prosecutor complained that it was his "thankless task to be slandered and accused of misconduct." Citing chapter and verse for the proposition that the government had the evidence, including the gun, the drugs, and the bullet, he inquired rhetorically:

> So what else can they do? Let's say [the prosecutor] is manipulating the truth. Well, this is a case about character. And I value my character.

He went on to state:

> What else do we know about the manipulators of truth in this courtroom? They slandered the Government back and forth like a ping-pong ball in the last five weeks.

In denying a mistrial, the trial judge ruled that these remarks were directed at J.D. and Irick, and that he (the judge) did not think the prosecutor had deliberately attempted to impute any improper motives to counsel. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 643–44, 94 S.Ct. 1868, 1871–72, 40 L.Ed.2d 431 (1974) (court should not attach the most sinister possible interpretation to the prosecutor's remarks).[19] Although there was some ambi-

**16.** We are not concerned here with improprieties of which the judge was not or could not be aware, such as the withholding of exculpatory evidence.

**17.** Ms. Dorsey emphatically denied any impropriety by the prosecutor, but testified that J.D. told her in a telephone conversation after his arrest that she should pretend that she could not remember relevant facts because she had been under the influence of drugs.

**18.** In the judge's words,

> Assuming a good faith basis to believe that the event inquired about occurred, there really is no doctrine of law that I'm aware of except for notions of civility and gentility that would require the defense to first ask the court before inquiring in that area.

**19.** The judge also expressed the view that, given the personal attacks on the prosecutor's integrity earlier in the trial, any accusatory response by the prosecutor which carried over to defense counsel—and the judge repeated his view that no such carry-over occurred—would be less prejudicial than under other circumstances. The Supreme Court made the same point in *United States v. Young, supra,* 470 U.S. at 17, 105 S.Ct. at 1047. The Court also stressed, and

guity in what the prosecutor said,[20] we are satisfied that, in context, his remarks would have been understood as having been directed at the defendants and not to J.D.'s counsel, and that in comparison with J.D.'s attorney, the prosecutor, though perhaps prone to use invective, was, if anything, more sinned against than sinning.

The prosecutor also remarked that defense counsel "sandbagged" Officer Lewis by adducing testimony that Irick believed that the two officers were armed robbers without interrogating Lewis on the subject. We find the use of the word "sandbagged" ill-chosen, especially since the prosecutor could have recalled Officer Lewis to the witness stand but did not do so.[21] There was no objection, however; [22] if there had been, the trial judge could have taken corrective action proportionate to the use of the ill-chosen epithet.

*Ad hominem* attacks against opposing counsel are uncalled for and unprofessional. *Sherer v. United States, supra,* 470 A.2d at 742; *see also Mathis v. United States,* 513 A.2d 1344, 1347 (D.C.1986). The prosecutor would have done better to "keep his cool," to choose his words more carefully, and to identify more precisely those to whom he was attributing mischief, distinguishing more clearly between defendants and their counsel, as well as between the individual attorneys. We cannot agree with appellants, however, that his remarks were egregious, or that in context they had any significant potential for affecting the verdict.

C. *"Expressing personal opinions regarding the credibility of witnesses"*

Irick and J.D. contend that the prosecutor improperly vouched for the credibility of his witnesses and denigrated that of Irick. We hold that with one relatively minor exception relating to a peripheral

we agree, that two wrongs do not make a right, and that it is appropriate for the judge to control improper defense tactics by corrective instructions or by an admonition to the "errant advocate," rather than by allowing the adversary to respond in kind. *Id.* at 12–14, 105 S.Ct. at 1044–45. The problem for the trial judge in this case was that J.D.'s counsel created a *fait accompli* by posing the accusatory questions, (as the judge eventually recognized that counsel had a legal right to do), without seeking prior leave of court. Even so, we repeat that although conduct by a defense attorney which the judge deems incompatible with notions of civility and gentility may make subsequent improprieties by the prosecutor more understandable, it cannot justify them.

**20.** In context, the prosecutor's allusion to "manipulators of truth," although in the plural, appears to have been directed to appellant J.D. who, according to Cassandra Dorsey, had urged her to testify that she could not remember the relevant facts. The prosecutor's remark that "they slandered the Government back and forth like a ping-pong ball *in the last five weeks,*" however, could be construed as referring to counsel, since the attorneys but not their clients were in action throughout the five-week trial. The reference could also have been to the defense witnesses collectively.

**21.** Moreover, the defense contention was not that the officers were robbing J.D. but that Irick believed that they were. Questioning Officer Lewis about Irick's perception might not, in our view, have been productive.

**22.** Like many trial judges, Judge Weisberg had a stated policy of discouraging objections during closing argument, so that the flow of counsel's presentation would not be interrupted. He explained, however, that this rule was not an "ironclad" one, and recognized that "there are some things that are so objectionable that [they] simply require interruption so that damage that might be done can be undone." This practice, as described by the judge, seems to us entirely reasonable. *See* authorities cited at p. 32, n. 13, *supra.* Where contemporaneous objections have been discouraged, however, it is the judge's responsibility to assure that counsel have an opportunity to protect their clients' rights. When counsel appears to be treading close to matters that could cause substantial prejudice, the judge should consider convening a bench conference *sua sponte,* even during argument, to protect a litigant from prejudice.

In the present case, J.D. claims that his counsel did object to the word "sandbagging," but there are 22 lines of transcript relating to other matters between the prosecutor's use of that term and the next defense objection. When that objection was made, the judge overruled it summarily without interrupting the prosecutor to discern the precise nature of the defense objection. At the conclusion of the prosecutor's argument, J.D.'s counsel requested a mistrial on several grounds, but the allusion to "sandbagging" was not among them. Under these circumstances, we do not think that the issue was adequately preserved for appeal, and we find no plain error.

issue[23] the prosecutor's remarks on these matters were permissible comments on the evidence. The trial judge applied correct legal standards and committed no reversible error in failing to intervene *sua sponte* where no objection was made or in his denial of motions for a mistrial.

Defending Cassandra Dorsey's veracity, which had come under heavy attack during cross-examination, the prosecutor argued that she had demonstrated "character" and merited admiration by her willingness to testify for the government. He noted that she acknowledged her addiction and risked the enmity of the Daniels family, with whom she lived, and that it showed courage to come in and say, in effect, that "it's wrong to shoot a cop and that's why I'm here." None of the defense attorneys ever objected to these remarks, which were made primarily during the prosecutor's initial closing argument. The prosecutor was doing no more than drawing a reasonable inference from the evidence, and there was no reason for the judge to inject himself into the matter without being asked to do so.

Appellants also contend that the judge should have declared a mistrial because the prosecutor allegedly characterized Irick as a liar, primarily by referring to him sarcastically as Irick "the truthteller" and by stating or implying in other ways that he was not telling the truth. The context of these comments reveals that all but those relating to Irick's employment and residence were made in connection with descriptions of evidence contrary to that of Irick. They were generally coupled with an invitation to the jurors to believe other witnesses and to discredit Irick's testimony, either directly or in the form of a rhetorical question. The trial judge denied mistrial motions because the prosecutor

> is certainly entitled to comment on the credibility of Mr. Irick.... The Court of Appeals may some day say that sarcastically referring to a witness as a truth teller is the same kind of arguably improper argument as calling a witness a liar, which I never thought was improper until the Court of Appeals said so. I don't think the Court of Appeals has said that yet and I don't think the argument was in any way improper....

We agree with the trial judge's analysis.[24]

Despite decisions in the dozens, the law governing what a prosecutor may or may not say about the credibility of a testifying defendant or defense witness is not always easy to discern or apply. On the one hand, "this court has repeatedly condemned assertions by counsel that a witness had lied on the witness stand." *Jones v. United States,* 512 A.2d 253, 257 (D.C.1986). "It is for the jury to decide whether a witness is truthful, and an attorney may not inject personal evaluations and opinions as to the witness' veracity." *(Philip) Dyson v. United States,* 418 A.2d 127, 130 (D.C. 1980); *Jones, supra,* 512 A.2d at 257.[25] Characterization of defense testimony as incredible is permissible, on the other hand, "when it is a logical inference from the evidence, and not merely the prosecutor's personal opinion as to appellant's veracity." *Hammill v. United States,* 498 A.2d 551, 557 (D.C.1985). Indeed, "characterizing testimony as incredible is an accepted and proper form of comment on contradictory testimony." *(Philip) Dyson, supra,* 418 A.2d at 130. In *Kleinbart v. United*

23. The prosecutor asked rhetorically during his initial closing argument why Irick did not tell the truth about his employment record. He failed to allude explicitly to the evidence provided by Irick's employers which contradicted Irick's testimony. There was no objection, and Irick's counsel responded in some detail in his closing argument.

Although the prosecutor's description of Irick's testimony on this subject as untrue, without discussing the supporting evidence, was unfortunate, we are confident that the jurors could connect that description with the record testimony on the point and would not believe that the prosecutor's remark was based on some undisclosed information in his possession. Moreover, the issue was collateral and it is most unlikely that the incident had any impact on the verdict.

24. The judge expressly cautioned counsel to stay away from name-calling and, in particular, from calling any witness a liar.

25. For a discussion of an advocate's ethical responsibilities in this regard, *see Young, supra,* 470 U.S. at 7–8, 105 S.Ct. at 1042–43.

*States,* 426 A.2d 343, 352 (D.C.1981), this court held that it was acceptable for the prosecutor to call defense testimony "suspicious" and "perjured," and to claim that the defendant "conjured up witnesses [who] ... lied to you," where there was a basis in the evidence for these charges.

Although it may be difficult to reconcile the results in these cases with one another, they all support the proposition that the key inquiry is whether the attorney is commenting on the evidence, which he may do, or expressing a personal opinion, which is taboo. A comment will be within the acceptable range as long as it is in the general nature of argument, and not an *outright* expression of opinion. *Logan v. United States,* 489 A.2d 485, 490–91 (D.C.1985); *Arnold v. United States,* 467 A.2d 136, 138 n. 2 (D.C.1983) (*per curiam*).[26]

In the present case, the prosecutor expressly stated to the jurors, both in his initial closing argument and in rebuttal, that he was not claiming that anyone was lying, and that it was their responsibility to decide where the truth lay.[27] As stated above, the remarks of which appellants complain were sufficiently tied in to the discussion of the evidence to avoid any suggestion that the prosecutor was in effect adding his own unsworn testimony[28] to the evidence in the record. His recitation that the jury must decide issues of credibility, together with the judge's instructions to the same effect, made it unlikely that the jurors were misled or that they convicted appellants for improper reasons.

Reasonable people may differ about the appropriateness of the prosecutor's apparent sarcasm in referring to Irick as a "truthteller." "It should not be necessary to explain ... that sarcasm and ridicule are not the stuff of good argument or good taste in judicial proceedings. When the government resorts to such behavior, we are the poorer for it." *Carter v. United States,* 141 U.S.App.D.C. 259, 261, 437 F.2d 692, 694 (1970), *cert. denied,* 402 U.S. 912, 91 S.Ct. 1393, 28 L.Ed.2d 655 (1971). The prosecutor may, on the other hand, prosecute "with earnestness and vigor." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935); *Young, supra,* 470 U.S. at 7, 105 S.Ct. at 1042. Just as he need not sanitize the government's evidence or cleanse it of its emotional impact, *Powell v. United States,* 485 A.2d 596, 599 (D.C.1984), *cert. denied,* 474 U.S. 981, 106 S.Ct. 420, 88 L.Ed.2d 339 (1985), so too he is not required to articulate his arguments in a dreary monotone stripped of all emphasis, spirit, or indignation. *Cf. Mathis v. United States,* 513 A.2d 1344, 1348 n. 10 (D.C.1986). A prosecutor "certainly is free to strike hard blows at witnesses whose credibility he is challenging." *Harris v. United States,* 131 U.S.App.D.C. 105, 108, 402 F.2d 656, 659 (1968). Although name-calling is out of

26. The Supreme Court analyzed the problem in this way in *Young, supra,* 470 U.S. at 18–19, 105 S.Ct. at 1047–48.

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

27. Defense counsel also vigorously attacked the credibility of the opposition's witnesses. J.D.'s attorney, who told the jury, as the prosecutor did, that "I'm not saying anybody lied in this courtroom," nevertheless said of the government's expert that "he'll say anything" and that "he'll tell you what needs to be told." He also made some ambiguous remarks which could reasonably be construed as accusing the government of "molding" and "shaping" the evidence to make his client seem guilty. Irick's counsel argued that Cassandra Dorsey came down to court "to share fabricated information, we submit."

28. The prosecutor's comment that he valued his character, of which appellants also complain, was obviously directed to the intimations by J.D.'s attorney that he had pressured Cassandra Dorsey to lie for the government. It cannot reasonably be viewed as a statement vouching for the veracity of his witnesses.

bounds, a bland presentation robs the adversary system of the life and zest which are needed to capture and retain the jury's attention and ensure an interested and informed search for the truth. The Constitution does not require prosecutors to be boring.

There was extensive evidence in the record to support the contention that Irick was lying,[29] and we agree with the trial judge that the prosecutor's tactics in regard to Irick's credibility did not exceed the bounds of propriety.

D. *"Arguing facts not in evidence"*

Officer Wallace testified that when Irick approached the scene, gun drawn, J.D., still on the ground, said:

> Get them Boo [or Butch]. Don't let them take me. Shoot them. Don't let them take me.

In his initial closing argument, the prosecutor described the event in the following manner:

> Jerry is doing what he knows Curtis is paid to do. He's letting him know now's the time Curtis, get 'em off me. I don't want to go to jail for selling dope. They ain't got their guns out then, I'm not going to be caught in the cross fire. You get them off me.

A few minutes later, the prosecutor addressed Irick's state of mind:

> Isn't that the mind of a man who wanted to kill that night? Running with his business partner. Who knew, as *Detective Brown told you,* that Curtis Irick was out there for one purpose and that's to have a pistol to protect him.

(Emphasis added.) In fact, the trial judge had stricken Detective Brown's testimony that the other members of the distribution unit would know that the enforcer was there to protect them.

No objection was made by any of the defense counsel to either of these passages in the prosecutor's argument, nor did any defendant seek a mistrial on the basis of either comment. We must therefore decide whether the trial judge committed plain error by failing to intervene *sua sponte.* We are satisfied that he did not.

Appellants argued that the prosecutor, by adding the words "I don't want to go to jail for selling dope" to Officer Wallace's description of J.D.'s remarks, effectively created evidence that J.D. knew that Lewis and Wallace were police officers. Whether the officers had identified themselves as police, and whether appellants knew that they were officers, was a major factual issue in the case. The government responds that the prosecutor was simply drawing reasonable inferences about J.D.'s state of mind, based on what J.D. said and other evidence of collaboration between him and Irick. The precise words used by the prosecutor could reasonably be construed either as describing what J.D. said (in which case they would be improper)[30] or as arguing what he was probably thinking (in which case the inference being drawn from all of the evidence would, in our view, be reasonable).

Greater precision on the prosecutor's part would undoubtedly have been helpful to the jury. As it was, however, defense counsel had the opportunity to address the alleged misstatement in their closing arguments, and perhaps to "score points" with

29. *E.g.,* Irick testified that he came a substantial distance to buy cocaine from J.D. although he did not know him well and had bought drugs from him only once, at a different location. He related that, evidently by coincidence, he was transporting his "antique" weapon from one parent's garage to the other parent's home when an extraordinary occasion for using it—an apparent armed robbery of J.D. by robbers who turned out to be police officers—unexpectedly arose. He then fled to the home of a man he hardly knew, and left his "antique" gun with the man's brother. Irick's version also required the jury to believe that the officers failed to identify themselves when Irick was about to shoot Officer Lewis, or even thereafter. Reasonable jurors might find it improbable that the officers would thus augment the risk of death to avoid disclosure.

30. We entertain some doubt that the prosecutor intended his recitation to be understood as describing J.D.'s precise words. The occasion was hardly one in which J.D. would have focused on the precise violation for which he was in danger of being imprisoned.

the jury by demonstrating the prosecutor's inaccuracy or imprecision. The trial judge instructed the jurors that their recollection of the evidence controls, and we do not think that the comments in question warrant reversal.

Turning to the prosecutor's infelicitous allusion to what Detective Brown had said, it was undoubtedly inappropriate to predicate an argument that J.D. knew that Irick was there to protect him on the detective's stricken testimony. Although the government correctly claims that there was ample basis in the record to support an inference that J.D. knew that Irick was there and why, this does not excuse the improper recitation of testimony which was not in the record in support of a hotly disputed proposition.

An objection to this mischaracterization of the evidence might well have resulted in a firm correction by the trial judge, who had previously ruled on the relevant legal question in appellants' favor. This was, however, hardly a situation so extreme that it required or even warranted intervention by the judge in the absence of an objection from any of the defense attorneys. By failing to object, even at the conclusion of the prosecutor's argument, defense counsel precluded a measured remedy for the prosecutor's misstatement. There was no plain error.

E. *"Improper depiction of appellants as members of a sinister and vicious drug organization"*

J.D. and to some extent Irick claim that the prosecutor, by use of "inflammatory rhetoric," [31] and otherwise, improperly depicted them as members of an organized drug ring. They contend that this depiction was accomplished by the basic "pitch" of the case, and also, among other thing, by references to Irick as "Dirty Harry" and "the enforcer" and to his weapon as a "cannon." They also complain that the judge abused his discretion in allowing the prosecutor, during his cross-examination of Irick, to demonstrate the use of the weapon with which Officer Lewis had been shot.

We think that the basic theme of the case was determined by the facts. One appellant, J.D., was selling cocaine from a pouch. His brother was advertising the same wares a short distance away. When J.D. was arrested, Irick came to his rescue with a .44 magnum. The prosecution's ballistic expert identified the weapon as the largest and most powerful handgun available, explaining that it fires the largest bullet at the highest velocity. Irick shot an officer at J.D.'s behest, and the two men fled together and caused the gun to be hidden. J.D. also attempted to tamper with a witness. If the government's witnesses were believed as to what happened, then this was not a case of some choir boys engaged in a naughty prank. Rather, the record illustrates the force of Detective Brown's testimony about the intimate relationship between drugs, guns and, in this case, potentially lethal violence. The prosecutor had no obligation to pull his punches in describing the sordid scene depicted by the evidence. *See (William) Powell, supra,* 485 A.2d at 599.

That Irick was a "bodyguard" or "enforcer" could reasonably be inferred from the evidence of what he did. The prosecutor occasionally called him both. Expert testimony which the trial judge properly admitted also supported the prosecutor's characterization of Irick's role. There was no impropriety.

Cassandra Dorsey testified that she knew Irick as "Dirty Harry." The trial judge, recognizing the potential for prejudice resulting from the term, instructed both the prosecutor and Ms. Dorsey not to use it. On one subsequent occasion, the prosecutor, apparently inadvertently, made a reference to "Dirty Harry" while examining Ms. Dorsey. Ms, Dorsey also repeated the nickname on approximately three occasions after being directed not to do so, and was properly reproved by the judge. There is no indication of any com-

31. In rhetoric that itself is not exactly understated, J.D. claims that "the prejudicial impact of the prosecutor's misconduct cannot be overstated." Indeed, J.D.'s brief is replete with adjectives such as egregious, outrageous, "rife with classic improprieties," etc. where, at least to the writer, nouns and verbs would have been at least as persuasive.

plicity by the prosecutor in Ms. Dorsey's failure to adhere to the judge's directions,[32] however, and under these circumstances her lapses are not attributable to the government. *Carter v. United States*, 497 A.2d 438, 441 (D.C.1985).

References to Irick as "Dirty Harry" also came before the jury on Ms. Dorsey's redirect examination, but the judge held that the defense had "opened the door." [33] Although we agree with our dissenting colleague that the doctrine of "curative admissibility" can be over-used, and although the judge would have been acting within his discretion if he had excluded the grand jury testimony despite defense counsel's inquiry on cross-examination, we do not think that he abused that discretion by ruling the other way. The issue of Ms. Dorsey's credibility was critical, and the implication on cross-examination that her prior testimony about Irick was recently fabricated went directly to that issue. Moreover, even if the admission of the evidence was erroneous, we are confident that any error was harmless, for the nickname added little to the evidence itself.[34]

During the cross-examination of Irick, the prosecutor pulled the trigger of the latter's weapon on several occasions to show that it had to be recocked each time before firing. The trial judge explained the purpose of the demonstration as follows:

> In the context of this trial where the witness has testified that he—just after the first shot just panicked, and even as to the first shot wasn't trying to hurt anybody, after the first shot he panicked,[35] ... and therefore he took the gun down from their heads, at which it was originally pointed, to shoot Officer Lewis in the hand.
>
> It seems to me that the—the firing mechanism of this particular gun, that is, the effort it takes to pull the hammer back before you can pull the trigger is a relevant piece of evidence.

The trial judge has broad discretion in determining whether, and in what fashion,[36] courtroom demonstrations should be permitted, for he is in the best position to

32. The trial judge, who was in a position to evaluate the situation first hand, remarked that "the reason it happened is because that [Dirty Harry] is the only way she knows him by."

33. On cross-examination, Ms. Dorsey had been interrogated about whether she knew Irick under a different nickname. To counteract the implications of this line of questioning, the prosecutor read Ms. Dorsey's grand jury testimony to the jury. The trial judge ruled that

> the reference to Dirty Harry, all that was a quotation from the questions and answers in the witness' grand jury testimony. And it seems to me that it was not only fairly opened up by [Irick's counsel], ... it was almost necessarily opened up, and that the redirect examination was entirely proper.

None of the defense attorneys objected to the allusions to Dirty Harry while the testimony was being read or requested redaction. Instead, they moved for the more drastic remedy of a mistrial after the allegedly offending words had been read.

34. Following the popularity of the Clint Eastwood motion picture so titled, the term "Dirty Harry" has come to connote a tough man with a .44 magnum. There was far more than this unwanted sobriquet to show that Irick was such a man. He admitted that he had the weapon in question and that he had previously kept it at his father's garage. He claimed to have been transporting it to his mother's house. He acknowledged having taken it with him on an expedition to purchase unlawful drugs—rather an odd destination for an antique—and that he had used it to shoot a man who turned out to be Officer Lewis. On these facts, it was surely the evidence of Irick's connection with and use of the .44 magnum, rather than the proscribed allusions to his alleged nickname, that resulted in his conviction. Any claim of prejudice to J.D. in this connection is even more tenuous, for the nickname was personal to Irick and conveyed little if anything about his codefendants.

35. Irick had testified that "it happened so fast I couldn't think no way" before pulling the trigger.

36. If, as the dissent suggests, the demonstration had been effected by an expert witness, this might have occurred days after Irick had given the version of events which the prosecutor was attempting to refute by showing how the weapon worked. Moreover, it would have been impossible to confront Irick contemporaneously with the apparent contradiction between his testimony and the actual operation of the .44 magnum. *See also United States v. Skinner*, 138 U.S.App.D.C. 121, 124, 425 F.2d 552, 555 (1970) (proper exercise of discretion to allow prosecutor to stand on courtroom table to simulate defendant's position in ledge above victim of an assault).

"judge whether the game is worth the candle," *i.e.*, to weigh probative value against potential prejudice. *Hamilton v. Pepsi Cola Bottling Co.*, 132 A.2d 500, 502 (D.C. 1957), *cert. denied*, 356 U.S. 961, 78 S.Ct. 1000, 2 L.Ed.2d 1068 (1958); McCormick on Evidence § 215 at 677 (3d ed. 1984 and Supp.1988). We may disturb the judge's decision that the evidence is more probative than prejudicial only upon a showing of grave abuse of discretion. *Morgan v. District of Columbia*, 263 U.S.App.D.C. 69, 83–84, 824 F.2d 1049, 1063–64 (1987); *see also Dailey v. District of Columbia*, 554 A.2d 339, 340–41 (D.C.1989). Appellants have made no such showing here.

VI

We have considered all of appellants' other contentions and conclude that they are without merit.[37] Applying the legal standards set forth at pp. 32–33, *supra*, we are satisfied that the prosecutor's lapses described in this opinion, individually or in the aggregate, were not nearly as serious as Irick and J.D. claim, that the trial judge handled the issues responsibly, that the government's case, if believed, was compelling, and that Irick and the Daniels brothers were not denied a fair trial. Accordingly, the convictions of all three appellants are hereby *Affirmed.*

NEWMAN, Associate Judge, dissenting:

A trial is perforce a contest. The rules under which trials are conducted are designed to produce light rather than heat. However, heat often results.[1] Our system looks primarily to the trial judge to minimize the heat and to counteract it when it risks interfering with the light.[2] Counsel, of course, have a duty in this regard as well. This case involves an evaluation of how the participants in one trial performed their respective duties and the impact of those performances on the constitutional right of the defendants to a fair trial.

Perfection seldom, if ever, will be found in things wrought by humans. Thus, what the Constitution guarantees to litigants is a fair trial, not a perfect one.[3] I cannot, however, overlook the numerous and serious instances of prosecutorial misconduct in this case as an unfortunate but acceptable product of an imperfect legal system. Where I part company from the majority, is with their holding that Curtis Irick and Larry and Jerry Daniels had the fair trial to which they are constitutionally entitled. I strongly assert that they did not. In my view, the misconduct was met by inadequate—and sometimes inappropriate—responses and correctives by the trial court, and thereby deprived Irick and Jerry Daniels of a fair trial. I would reverse Larry Daniels' conviction on evidentiary sufficiency.

I. *Prosecutorial Misconduct*

In this trial, the United States was represented by Wallace Kleindienst, an Assist-

37. We specifically hold that the prosecutor committed no impropriety by his "folksy" recitation of an "old Arizona saying" that if the defense case is weak, "you slander the prosecutor." This case is unlike *Curry v. United States*, 520 A.2d 255, 267 (D.C.1987), in which this court viewed as improper the prosecutor's characterization of a defense *on the merits*—that the police "planted" the drugs—as a last resort of a defendant "who had nothing left."

We also reject as baseless J.D.'s contention that the prosecutor engaged in misconduct by arguing that, if Irick's testimony was truthful, the prosecution witnesses must have lied. The salutary rule that a cross-examiner may not ask a witness whether other witnesses are lying, (*Wayne*) *Carter v. United States*, 475 A.2d 1118, 1126 (D.C.1984), *cert. denied*, 469 U.S. 1226, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985), because, as the trial judge ruled in this case, one witness may not express an opinion about another's credibility, does not preclude an attorney from drawing reasonable inferences during his closing argument from contradictory testimony in the record.

1. "It is impossible to expect that a criminal trial shall be conducted without some showing of feeling; the stakes are high, and the participants are inevitably charged with emotion." *United States v. Wexler*, 79 F.2d 526, 529–30 (2d Cir. 1935), *cert. denied*, 297 U.S. 703, 56 S.Ct. 384, 80 L.Ed. 991 (1936), *quoted in United States v. Young*, 470 U.S. 1, 10, n. 8, 105 S.Ct. 1038, 1043 n. 8, 84 L.Ed.2d 1 (1985).

2. *Young, supra*, 470 U.S. at 10, 105 S.Ct. at 1043.

3. *See Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986).

ant United States Attorney; Jerry Daniels was represented by Samuel Delgado, of the Public Defender Service.[4] The conduct of counsel at issue in this case primarily is that of these two lawyers.

The notion that the prosecutor merely responded to offensive tactics by the defense counsel manifests itself in several aspects of the majority opinion. Most notably, the majority asserts that the prosecutor's remarks were provoked, and thus permissible, as a "fair response" to previous actions of defense counsel. *See Young, supra,* 470 U.S. at 11–14, 105 S.Ct. at 1044–46 (discussing doctrine of "invited response"). This notion then colored another aspect of this trial—for the majority, as well as the trial court, misapplied the doctrine of "opening the door" as part of its thesis that the prosecution was simply reacting to the defense and allowed defendant Irick to be repeatedly referred to as "Dirty Harry." *See infra,* at 44–46. Finally, the majority claims to analyze the effect of the prosecutorial misconduct in the context of the entire trial. Having stated the correct analytical approach, the majority fails to apply it to this case. Rather, they analyze each allegation of prosecutorial misconduct without an adequate evaluation of the "cumulative effect" of all of the misconduct, (much of which the majority concedes occurred), to determine whether substantial prejudice occurred, thus depriving defendants of a fair trial. *See, e.g., Mathis v. United States,* 513 A.2d 1344, 1349 (D.C.1986); *Powell v. United States,* 455 A.2d 405, 411 (D.C. 1982). I discuss the doctrine of invited response and the doctrine of opening the door in more detail since, in my view, they were so grossly misapplied by the majority.

No trial is likely to be totally uneventful; this one surely was not. The events during trial which are at issue here began during the cross-examination by Delgado of a principal government witness, Cassandra Dorsey. At the time of her testimony, Dorsey was confined at the D.C. Jail awaiting a hearing in a probation revocation proceeding. She had previously testified for the government in two murder cases. When asked by Delgado whether Kleindienst had threatened her with respect to her testimony in this case, she responded, "No." Upon objection by the government, and after a short bench conference, the trial judge excused the jury.

The trial judge then inquired of Delgado as to his good faith basis for his question, characterizing it as one "which I consider to be at least in absence of a good faith basis, one of the most outrageous quesitons I've ever heard asked of a witness in open court in front of a jury." (Tr. IV 1165). Later, the court explained: "The only reason I'm so exercised about it Mr. Delgado is because you've accused an officer of this court, an Assistant United States Attorney, and in my experience with him one of the most highly ethical Assistant United States Attorneys I've ever run into, of threatening a witness, which I know in my heart he did not do." (Tr. IV 1167). Still later, the trial court said: "And what you've put in front of this jury as if it were true is that Mr. Kleindienst has been threatening witnesses. And that's not true, no matter what Ms. Dorsey would say about it." (Tr. IV 1170).

Having thought about the matter during an overnight recess, the trial judge amplified his views. He stated:

> I lost my temper a bit and excused the jury and because I did not think that was a—the kind of question, regardless of whatever good faith basis Mr. Delgado may have had for it, that should have been asked in front of this jury without a strong basis to believe that it was in fact true, and without having first cleared it with the Court.
>
> I have thought about it overnight and my position remains the same, although I guess I can see if I were in Mr.—in defense counsel's role why I would take a different point of view about that. Obviously the defense has a right to cross-

4. Larry Daniels was represented by Charles Stow, Esquire, Curtis Irick, by Roger Durban, Esquire.

examine the witness based on bias or motive to testify and assuming a good faith basis to believe that the event inquired about occurred, there really is no doctrine of law that I'm aware of except for notions of civility and gentility that would require the defense to first ask the Court before inquiring in that area. I would have hoped that any lawyer practicing in my court would have done so, but I am not at all sure that there is an absolute requirement in the law that it be done.

In any case the way it was left was that I would at least upon request voir dire the witness out of the presence of the jury this morning to determine what her answers to that series of questions would be and then make a ruling out of the presence of the jury whether or not that line of examination could be pursued. I'm still willing to do that, but it occurred to me during the overnight recess that for *tactical reasons* Mr. Kleindienst may prefer that I do not do that, allow the line of examination.

Tr. IV 1197–98 (emphasis added).

The court further opined: "I think the law is, as [Delgado] stated it last night, that even if he can't complete the impeachment if he has a good faith basis for undertaking it, he has a right to do so." [5] (Tr. IV 1201).

After further inquiry, the court held that Delgado did in fact have a good faith basis for his questions to Dorsey, and thus, they were proper.[6]

The Supreme Court has recently discussed the so-called "invited response" or "invited reply" issue in *Young, supra,* 470 U.S. 1, 105 S.Ct. 1038. In *Young,* the defense counsel in closing argument accused government counsel of, among other things, unethical conduct, of making statements designed "to poison your minds unfairly" and of prosecuting the defendant while knowing he was not guilty. *Id.* at 4–5, 105 S.Ct. at 1040–41. The prosecutor never objected. The prosecutor responded in kind in his rebuttal argument. The defendant never objected or requested curative instructions. The Supreme Court pointed out that the issue presented, given the absence of objections, was one of plain error. In language poignantly relevant to the issues in this case, the Court said: "The kind of advocacy shown by this record has no place in the administration of justice and should neither be permitted nor rewarded; a trial judge should deal promptly with any breach by either counsel." *Id.* at 9, 105 S.Ct. at 1043. The Court made clear that the proper course for the trial judge is to prevent or correct improper conduct by either side in a trial:

> We emphasize that the trial judge has the responsibility to maintain decorum in keeping with the nature of the proceeding; "the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct." *Quercia v. United States,* 289 U.S. 466, 469 [53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933). The judge "must meet situations as they arise and [be able] to cope with ... the contingencies inherent in the adversary process." *Geders v. United States,* [425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976)]. Of course,

5. I have quoted the trial judge's remarks extensively for I deem it fairer to do so than to characterize or summarize them. *See Holy Bible,* The New King James Edition, Act 26–1 ("Then Agrippa said to Paul, 'You are permitted to speak for yourself.' ").

6. It was during the same overnight recess that provided the trial judge with an opportunity to reflect on his prior expression of dissatisfaction with Delgado's conduct that an incident occurred, which Delgado reported to the trial court the next morning. As reported by Delgado, about ten to fifteen minutes after the court had excused the jury (and thereafter excused counsel), he was proceeding down the courthouse escalators when he was confronted by Kleindienst who, while waving his finger in Delgado's face, threatened to "bust" Delgado in the mouth. Delgado reported that the threat was repeated several times in the presence of a number of police officers, who were apparently witnesses in the case. Delgado stated that he could not tell whether any jurors witnessed the incident and requested that they be voir dired. Kleindienst's only response was to indicate, when asked by the court, that he had no objection to such a voir dire. As I set forth hereafter, Kleindienst resumed his verbal assault upon counsel in closing argument.

> "hard blows" cannot be avoided in criminal trials; both the prosecutor and defense counsel must be kept within appropriate bounds. *See Herring v. New York,* 422 U.S. 853, 862 [95 S.Ct. 2550, 2555, 45 L.Ed.2d 593] (1975).

*Id.* 470 U.S. at 10–11, 105 S.Ct. at 1043–44.

It is in retrospect, upon appellate review, that the evaluation of invited response becomes relevant, for it is only when the prosecutor's conduct has deprived the defendant of a fair trial that reversal of a conviction is appropriate. *"In this context,* defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant." *Id.* at 12, 105 S.Ct. at 1044 (emphasis added) (citing *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 242, 60 S.Ct. 811, 853, 84 L.Ed. 1129 (1940); *Crumpton v. United States,* 138 U.S. 361, 364, 11 S.Ct. 355, 356, 34 L.Ed. 958 (1891)). Indeed, as the Court in *Young* stated:

> In retrospect, perhaps the idea of "invited response" has evolved in a way not contemplated. *Lawn* [*v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958) ] and the earlier cases cited above should not be read as suggesting judicial approval or—encouragement—of response-in-kind that inevitably exacerbates the tensions inherent in the adversary process. As *Lawn* itself indicates, the issue is not the prosecutor's license to make otherwise improper arguments, but whether the prosecutor's "invited response," taken in context, unfairly prejudiced the defendant.

*Supra,* 470 U.S. at 12, 105 S.Ct. at 1044–45. The Court further stated that:

> Courts have not intended by any means to encourage the practice of zealous counsel's going "out of bounds" in the manner of defense counsel here, or to encourage prosecutors to respond to the "invitation." Reviewing courts ought not to be put in the position of weighing which of two inappropriate arguments was the lesser. "Invited responses" can be effectively discouraged by prompt action from the bench in the form of corrective instructions to the jury and, when necessary, an admonition to the errant advocate.

*Id.* at 13, 105 S.Ct. at 1045.

Of particular relevance here is the Court's observation that the preferable response when one counsel has engaged in objectionable conduct is for the trial court to deal promptly with that objectionable conduct and, thus, obviate the need for adversarial response. After holding that the prosecutor's "responsiveness" argument in *Young* was error, the Court noted that the prosecutor's first error was in failing to ask the trial court to deal with defense counsel's improper conduct. *Id.*

It is within this analytical framework that I consider the prosecutorial misconduct which took place in this case. "Inquiry designed to elicit possible bias is a major purpose of cross-examination" and, as long as counsel has a good faith basis, such questions are proper. *See Springer v. United States,* 388 A.2d 846, 855 (D.C. 1978); *see also Sherer v. United States,* 470 A.2d 732, 736 (D.C.1983), *cert. denied,* 469 U.S. 931, 105 S.Ct. 325, 83 L.Ed.2d 262 (1984). The trial judge in this case found no lack of a good faith basis on the part of defense counsel. Indeed, the trial judge recognized correctly that: "[A]ssuming a good faith basis to believe that the event inquired about occurred, there really is no doctrine of law that I'm aware of except for notions of civility and gentility that would require the defense to first ask the court before inquiring in that area." (Tr. IV 1198). As the trial judge correctly stated the law thereafter, "the law is ... that even if [counsel] can't complete the impeachment if he has a good faith basis for undertaking it, he has a right to do so." (Tr. IV 1201).

Defense counsel articulated the grounds to support his good faith basis for the record. At the time of cross-examination, Cassandra Dorsey, who was known to be a drug addict and to have testified for the government in two prior murder cases, was incarcerated for violating the terms of her probation. At the time of the incident at issue in this case, she lived with her boyfriend Ronnie Daniels, brother to Larry

and Jerry Daniels. On direct examination, she testified that on the evening of the incident, she answered the front door to find Jerry Daniels and "Dirty Harry" [Irick] standing there. She testified further, on cross-examination, that she observed Tommy Daniels (another Daniel brother living in the house) bury the gun (given to him by Jerry) behind the garage. Defense counsel, however, had been told by a witness—whose identity counsel refused to divulge, although from the record, it apparently was his client—that Dorsey told him she never saw anyone bury a gun and merely opened the door for the two men. As a result, Dorsey told this person that the prosecutor harassed her repeatedly by calling her out of her cell at the D.C. jail and threatened her with imprisonment for five years. Delgado noted that when relating these events to the witness Dorsey had not been clear as to whether the five years would be for her role as an accessory after the fact, perjury or both. In any event, after allegedly threatening her the week prior to testifying, the prosecutor allegedly gave her the weekend "to think" about her testimony. Dorsey then called the witness and communicated in detail her predicament. Finally, Delgado suggested that this person also told him that the prosecutor may have indicated that Dorsey's cooperation might result in her release the day following her hearing on the probation violations, which hearing was scheduled to occur three days after the date she was to testify in this case.

To the extent that harm in the form of parading innuendo before the jury is likely to occur from asking the question despite a negative response from the witness, the proper course is to give a prompt jury instruction. Twice in this case the trial judge offered to give such an instruction. (Tr. IV 1179, 1201). With respect to his second offer to do so the trial judge stated:

> And what the Government is entitled to is an instruction that says in effect there's absolutely no evidence that the witness—if this turns out to be the fact —there's no evidence that the witness was threatened or intimidated in anyway or that she said she had been. The questions of counsel are not evidence, only what the witness says under oath. And her testimony under oath is what it is. I'd certainly be willing to give such an instruction ...

(Tr. 1201–02). The prosecutor immediately declined to accept the trial court's offer, reasoning that:

> We all know how much stock jurors put in these instructions. It varies in degree, Your Honor. My only concern—I can see where this trial is going. I'm on trial myself. I don't appreciate it.

(Tr. IV 1202). Having rejected the court's offer of a curative instruction, which apparently was done for "tactical reasons," and preferring to use closing argument as a "corrective," the prosecutor thereafter made no instructional request about this matter.

It was at this juncture that the trial judge transgressed the teachings of *Young, supra,* 470 U.S. 1, 105 S.Ct. 1038. The proper course for the trial judge, as *Young* indicates, was to give the instruction he proposed to give forthwith; to give it anew in his final instructions to the jury, and to impose proper limitations on closing argument by all counsel. While such limits properly would have permitted the prosecutor to argue the lack of evidence to contradict Dorsey's denial that she was threatened, such proper limits would have prohibited the type of argument in fact made by Kleindienst, which I discuss in more detail in Section A(1), *infra.* The trial court committed error in failing to do so. Simply put, there having been no wrongful conduct by Delgado, the trial court erred by permitting Kleindienst to tell the jury that there was.[7]

7. To what extent, if any, the trial judge may have been influenced by what he characterized as the "tactical reasons" for the prosecutor's actions is not clear from this record. If this factor was in fact considered by the trial court, such consideration was manifestly improper. *See Young, supra,* 470 U.S. 1, 105 S.Ct. 1038; *Johnson v. United States,* 398 A.2d 354 (D.C. 1979).

The majority likewise sanctions what I find to be other improper conduct by the prosecutor and error by the trial judge by holding that the trial court correctly ruled that Irick had "opened the door" to certain actions by the prosecutor. I refer to the trial court's permitting the government to repeatedly introduce evidence that Irick's nickname was "Dirty Harry," after having originally forbidden the use of that nickname.

Prior to testifying before the jury, it came out that Dorsey knew Irick by the nickname Dirty Harry and had so identified him to the police. The trial court instructed Dorsey and the government not to use the nickname Dirty Harry, given its association with the movie of that name in which Clint Eastwood helped make the .44 magnum infamous. In spite of that admonition, Dorsey used the nickname Dirty Harry several times to describe Irick in her direct examination before the jury. On the first occasion, the trial court sustained Irick's objection but declined to permit counsel to approach the bench. After Dorsey's second such reference, she was admonished both by the court and government counsel for doing so. She did so yet again, whereupon the trial court denied defense counsel's motion for mistrial. On cross-examination, Irick asked Dorsey if she knew the person identified as Irick by the nickname "Reds"; she stated that she did not.

On redirect, Mr. Kleindienst used Dorsey's grand jury testimony to interrogate her further. He read to her questions asked of her and answers she gave to those questions before the grand jury, in which reference is made to "Dirty Harry" eight times. It is this use of the term Dirty Harry on redirect examination, the use of which had been previously interdicted by the trial judge, which the trial judge and my colleagues say was properly admitted since Irick "opened the door."

The shibboleth "opened the door" is properly known as the doctrine of curative admissibility. *See United States v. Winston,* 145 U.S.App.D.C. 67, 71, 447 F.2d 1236, 1240 (1971); 1 J. WIGMORE, EVIDENCE § 15 (Tillers rev. 1983). *McCormick on Evidence* titles this evidentiary issue "Fighting Fire with Fire: Inadmissable Evidence as Opening the Door." § 57 (3d ed. 1984). The majority's discussion of the term "opened the door" merely adds to the obfuscation created by that term at the expense of the legitimate rationale for the doctrine of curative admissability.

An appropriate starting place of an analysis of curative admissibility is *Lampkins v. United States,* 515 A.2d 428 (D.C. 1986). There we said "the *sine qua non* of curative admissibility [is] 'the introduction of incompetent or irrelevant evidence by a party ...' " *Lampkins, supra,* 515 A.2d at 431 (quoting (*Duane*) *Dyson v. United States,* 450 A.2d 432, 442 (D.C.1982)). It is *only* where this first condition is met that any *issue* of curative admissibility arises at all.

Where the action of a party in introducing incompetent or irrelevant evidence satisfies this first condition, then the trial court must confront at least two other considerations. As we said in (*Duane*) *Dyson, supra,* if the door is in fact opened, it is opened "only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence." 450 A.2d at 442 (quoting *Winston, supra,* 145 U.S.App.D.C. at 71–72, 447 F.2d at 1240–41; *accord Lampkins v. United States, supra; Middleton v. United States,* 401 A.2d 109, 127 (D.C.1979); *Crawford v. United States,* 91 U.S.App. D.C. 234, 237, 198 F.2d 976, 979 (1952). The decision by the trial court to admit the curative testimony is a discretionary one; in the exercise of that discretion, the trial court must weigh undue prejudice against probativeness. *See Lampkins, supra,* 515 A.2d at 432; *Middleton, supra,* 401 A.2d at 127–28; *Curry v. United States,* 322 A.2d 268, 270 (D.C.1974); 1 J. WIGMORE, *supra,* § 15. *See generally Johnson, supra,* 398 A.2d 354. As Judge Harold Leventhal, speaking for the United States Court of Appeals for the District of Columbia Circuit, has said:

The trial judge [Judge William B. Bryant] put it expressively [citation omitted]:

> This business about 'opening the door' is a much overused issue and it carries with it an oversimplification. Opening the door is one thing. But what comes through the door is another. Everything cannot come through the door. This witness' testimony was certainly not in rebuttal to anything that the defendant testified to.

We agree with the reasoning of the trial judge. As noted in *United States v. McLain,* 142 U.S.App.D.C. 213, 216, 440 F.2d 241, 244 (1971): "The doctrine of curative admissibility is one dangerously prone to overuse." Permission to explore in rebuttal with testimony not admissible on direct, on the ground that the other party has opened the doors, rests "upon the necessity of removing prejudice in the interest of fairness." *Crawford v. United States,* 91 U.S.App.D.C. 234, 237, 198 F.2d 976, 979 (1952).

The doctrine is to prevent prejudice and is not to be subverted into a rule for injection of prejudice. Introduction of otherwise inadmissible evidence under shield of this doctrine is permitted "only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence." *California Ins. Co. v. Allen,* 235 F.2d 178, 180 (5th Cir.1956).

*Winston, supra,* 145 U.S.App.D.C. at 71, 447 F.2d at 1240.

Wigmore makes the point as follows:

> There is a general requirement that evidence submitted under the aegis of curative admissibility relate to the matter shown by the inadmissible evidence submitted by the other party. Generally speaking, this is a sensible requirement since the aim of curative admissibility is to give the party harmed by the introduction of inadmissible evidence an opportunity to counter the inferences that may be drawn from that inadmissible evidence; he should not be given a license to create prejudice of a different sort, unrelated to the prejudice caused him, merely so that he has a better chance of winning. Curative admissibility, in short, is designed to improve the accuracy of factfinding and is not designed simply to permit a party to avoid the harm done by giving him an opportunity to improve his chances of winning by increasing the possibility of erroneous factual adjudication with respect to some other matter.

1 J. WIGMORE, *supra,* § 15, at 749–50 (footnote omitted).

Weinstein forcefully states the same point:

> This concept of "opening the door" or "invited error" has been widely used to justify ignoring rules of evidence. Often it results in extremely prejudicial and time consuming inquiries. Attorneys may as a tactical matter, fail to object to a line in order to have the door opened to their own equally objectionable inquiries. The court ought to intercede to prevent this kind of gamemanship when it can be foreseen. Control of the trial should not be dissipated on the theory that two wrongs neutralize each other unless the court is convinced that there is no other practicable way to protect the parties while avoiding the dreadful waste of a mistrial.

WEINSTEIN'S EVIDENCE § 103[02], at 16 (1988).

Here, the trial judge had specifically instructed Dorsey and counsel not to refer to Irick by the nickname "Dirty Harry." The trial judge did so stating that " 'Dirty Harry,' in the minds [sic] of the jury, is associated with a .44 magnum." In spite of this admonition, Dorsey referred to Irick on direct examination as "Dirty Harry" three times in the presence of the jury.[8] The trial court sustained Irick's objections and admonished the witness. On cross-examination, Dorsey was asked whether she

8. The issue is not whether, as the majority implies, Dorsey's references can be attributed to bad faith on the part of the prosecutor. The issue is whether the trial judge erred in allowing the repeated use of the term "Dirty Harry" and whether the defendant was prejudiced thereby. *Carter v. United States,* 497 A.2d 438, 441 (D.C. 1985), cited by the majority is inapposite.

knew the person she identified as Irick by the nickname "Reds." Dorsey stated she did not; she said the only nickname she knew him by was "Dirty Harry." It was that the trial judge and my Brethren say opened the door to permit the prosecutor properly to use the nickname "Dirty Harry" on redirect examination, in Gatling gun fashion, on no less than eight occasions. I can think of few more egregious examples of the curative admissibility doctrine being misused to interject prejudice against an opposing party when the *sine qua non* simply does not exist in the first place, "merely so that [a party] has a better chance of winning." 1 J. WIGMORE, *supra*, § 15, at 750. Assuming that the trial court did in fact exercise discretion on this issue, a question not free from doubt, the exercise constituted an abuse thereof.

A. *Specific Instances of Prosecutorial Misconduct*

Viewed in context, it is clear to me that taken together, as well as alone, several instances of prosecutorial misconduct occurred, which prejudiced the outcome of this trial. They include the following: 1) attacks on the integrity of defense counsel, including statements by the prosecutor that he was slandered by defense counsel, references to defense counsel as "manipulators of the truth" and assertions that defense counsel "sandbagged" a witness; 2) the prosecutor's repeated expressions of personal opinion regarding the character of the witnesses, including the bolstering of government witnesses and the sarcastic dubbing of defendant Irick as a "truthteller"; 3) the prosecutor's prejudicial characterization of the case as one occurring in an organized and illicit drug world, through repeated references to Irick as "Dirty Harry," and "the enforcer," and his demonstration with the gun, dubbed "the cannon," which he cocked and "dry fired" in front of the jury several times, and 4) the prosecutor's argument of facts not in evidence. I consider each in turn:

*1. Attacks on the integrity of defense counsel*

It was improper for the government to argue on rebuttal that defense counsel "slandered" the government. Although a cold record often belies the intensity of emotion generated at a trial, the words of this prosecutor exemplified the emotional pitch reached in this case:

> All they give me is a beat-up old briefcase and a couple of legal pads. It's not an impressive force that is coming in to persecute [sic] these three men. But I guess that's the thankless job of being a prosecutor is sometimes you have to stand the abuse of being slandered, accused of misconduct because what else are they gonna do. We got the drugs. We got the guns. We got a bullet that almost killed an officer. We got the money. So what else can they do. Let's say that Mr. Kliendienst is manipulating the truth.
>
> Well this is a case about character. And I value my character.

(Tr. III 749). Later in rebuttal, the prosecutor addressed the substance of the charges and accused defense counsel of "manupulat[ing] the truth:"

> What else do we know about manipulators of truth in this courtroom. They slandered the government back and forth like a ping pong ball in the last five weeks.

(Tr. III 751). Finally, the prosecutor accused defense counsel of "sandbagging" Officer Lewis, stating: "why didn't they [defense counsel] ask them, did you say this, Jimmy Lewis. No. They sandbagged him. Sandbagged him." (Tr. III 760). The defendant's subsequent objections and motion for mistrial were denied.

Attacks that pale in comparison with the prosecutor's remarks in this case have been found improper by this court. Elsewhere we have stated, "it is improper ... for the prosecutor to impute thoughts and poor judgment to defense counsel." *Hammill v. United States,* 498 A.2d 551, 558 (D.C. 1985). In *Mathis v. United States,* this court reversed a conviction due, in part, to the comment that defense counsel at trial, "was leading the pack ... [just like] his client led the pack that night." 513 A.2d at 1347. The court determined that the cumu-

lative effect of this denigration of trial counsel along the prosecutor's dubbing appellant with the name "the Godfather," as well as vouching for the credibility of government witnesses, resulted in substantial prejudice. *Id.; see also Sherer, supra,* 470 A.2d at 742.

The comments that defense counsel were "manipulators of the truth" and that they "slandered the government" arose from the defense's questioning of Dorsey about potential grounds for bias and cannot be interpreted as a fair response, especially since, as the trial judge ultimately held, the law permits such cross-examination.[9] The majority's response to these comments misses the mark. Content to open the floodgates of the fair response doctrine, without any analysis of the effect of such comments on the jury's perception of defense counsel and, thus, of prejudice *to the defendant,* the majority concludes that the prosecutor "was, if anything, more sinned against than sinning." Curiously, the majority never says what constituted the original "sin." Prosecutors cannot, however, be permitted to convict defendants through an attack on their advocates. The remarks were improper, and the trial court erred when it failed at least to sustain defense objections and to strike the remarks with a curative instruction, or, in the alternative, perhaps to grant the motions for mistrial.

*2. Expressions of personal opinion by the prosecutor*

The prosecutor gave the jury his personal evaluation of the character of many of the important witnesses at trial. He vouched for Cassandra Dorsey's character,[10] whose history of drug addiction and pending sentencing called her truthfulness into question, as well as the truthfulness of Byron Wallace and Jimmy Lewis, whose statements were inconsistent, and Dorsey.[11] The prosecutor opined most profusely, however, upon the character of Curtis Irick, statements which potentially were prejudicial to Irick, as well as Jerry Daniels, for in order to secure convictions against them for the assault on a police officer, the prosecutor had to show that Irick was not present by happenstance and did not shoot Officer Lewis under the mistaken belief that Lewis and Wallace were hold up men. No less than six times,[12] the prosecutor sarcastically referred to Irick as the "truth teller"; in closing, he asked

9. The majority dismisses the comment that defense counsel "sandbagged" a witness, because no objection was made. I question the assurance with which the majority concludes that an objection was not registered to the "sandbagging" remark. Although I agree that the objection was not registered *immediately* after the comment was made, my reading of the transcript indicates that defense counsel waited until the prosecutor finished his thought before objecting, which objection was recorded on the following page of the trial transcript and was immediately overruled. This practice conformed with the trial judge's stated preference that objections during argument be made sparingly. Thus, it is wrong to penalize the attorney for following the preferred practice of the trial court. *See e.g., Hawthorne v. United States,* 476 A.2d 164, 169–70 (D.C.1984) (despite trial court's admonition to make contemporaneous objections, objections made after initial closing argument sufficient to preserve substantial prejudice review).

10. In closing, the prosecutor stated:

> And then comes in Ms. Dorsey. Poor Ms. Dorsey.... She took the stand, took an oath and said, yeah, I'm an addict. You saw her. But she had the human decency because she thought it was wrong to shoot a cop to come in here, take the stand and endure cross-examination, and have all kinds of motives thrown at her, thrown at me. She had that basic decent human decency. She rose above her condition. You've gotta have some admiration for the Cassandra Dorseys in this world. Because among the squalor, the pushers, the hawkers, the gunmen, somebody who lives in that same family had the courage and the guts, without any promises, to come in and say it's wrong to shoot a cop and that's why I'm in here.

Tr. III 575–76.

11. The prosecutor advised the jury in closing:

> Your job is to find the truth in this case. To find who are the truth tellers. And the Government submits then that when you sort through all the evidence you'll find that Byron Wallace told the truth, that Jimmy Lewis told the truth. That Jerry Barnes who didn't know these cops told the truth. That Kenny Ellerby who didn't know those cops told the truth. As did Cassandra Dorsey.

Tr. III 585.

12. *See* Transcript III at 560, 565, 569, 572, 577, 578.

without elaboration on the conflicting evidence, why Irick hadn't "told the truth" about his work history,[13] and baldly asserted several times that Irick was lying.[14]

The majority correctly states that the "key inquiry is whether the attorney is commenting on the evidence, which he [or she] may do, or expressing a personal opinion, which is taboo." *Supra,* at 35–36. Unlike the cases cited by the majority, however, the prosecutor in this case not only gave his explicit opinion as to the character of all of the major witnesses, but also outlined precisely who did and who did not tell the truth. Such comments cross the line between drawing permissible inferences from the evidence and expressing personal opinions. *See Logan v. United States,* 489 A.2d 485, 490 (D.C.1985); *Arnold v. United States,* 467 A.2d 136, 138 (D.C.1983).

This court has repeatedly condemned expressions of personal opinion about a witness' credibility:

> It is for the jury to decide whether a witness is truthful and an attorney may not inject personal evaluations and opinions as to a witness' veracity.

*Jones v. United States,* 512 A.2d 253, 257 (D.C.1986) (quoting *(Phillip) Dyson v. United States,* 418 A.2d 127, 130 (D.C. 1980)); *accord Chapman v. United States,* 493 A.2d 1026, 1030 (D.C.1985); *McCowan v. United States,* 458 A.2d 1191, 1198 (D.C. 1983); *Powell, supra,* 455 A.2d at 408. Allowing the expression of personal opinions about the credibility of a witness places before the jury questions of counsel's credibility and interferes with the jury's determination of the credibility of witnesses:

> To permit counsel to express his personal belief in the testimony ... would afford him a privilege not even accorded to witnesses under oath and subject to cross examination. Worse, it creates the false issue of reliability and credibility of counsel. This is peculiarly unfortunate if one of them has the advantage of official backing.

*(Duane) Dyson, supra,* 450 A.2d at 440 (quoting *Harris v. United States,* 131 U.S. App.D.C. 105, 107, 402 F.2d 656, 658 (1968)); *see also Young, supra,* 470 U.S. at 18–19, 105 S.Ct. at 1047–48; *Mathis, supra,* 513 A.2d at 1348. Expressions of personal opinion are particularly damaging when, as here, the credibility of a witness is crucial to the verdict. *Powell, supra,* 455 A.2d at 408; *(Phillip) Dyson, supra,* 418 A.2d at 130.

Similarly, counsel may not assert that a witness has lied on the witness stand. *Jones, supra,* 512 A.2d at 257 (citing cases); *(Phillip) Dyson, supra,* 418 A.2d at 130. In other cases comments by a prosecutor that a defense witnesses' testimony was "concocted," or unbelievable, *Powell, supra,* 455 A.2d at 408 "false" or "outright perjury" *(George) Miller v. United States,* 444 A.2d 13, 14 (D.C.1982) have constituted ground for reversal. *See also McCowan, supra,* 458 A.2d at 1198 (improper for prosecutor to imply untruthfulness by defendant in closing argument).

The majority notes that "[r]easonable people may differ about the appropriateness of the prosecutor's apparent sarcasm in referring to Irick as a "truthteller." *Supra,* at 36. I disagree. Even the trial court was fully aware of the potential im-

**13.** Specifically, the prosecutor stated:

> Ask [Irick's counsel] why your client didn't tell us the truth about where you work even today for the Northern Virginia Roofing. Why your client didn't tell us the truth about whether his working in December, or in November, or in September, or who cares. And why he didn't tell us the truth about where he was living.

Tr. III 584.

**14.** For example:

> Why did Mr. Irick not tell you the truth about that on the stand. (Tr. III 560).
>
> * * * * * *
>
> And do you believe Mr. Irick the truthteller when he says these two police officers had badges, radios, guns, walkie-talkies didn't even peep one word and say, police officer, Mr. Irick, would you mind putting the gun down. Do you believe that. Do you want to believe that. No. Didn't happen that way. (Tr. III 569).
>
> * * * * * *
>
> Who is telling the truth in this case? And why does Mr. Irick have to take the stand and tell you all those things that weren't true. (Tr. III at 572).

propriety of repeatedly referring to Irick as a "truthteller":

> the Court of Appeals may some day say that sarcastically referring to a witness as a truthteller is the same kind of arguably improper argument as calling a witness a liar, which I never thought was improper until the Court of Appeals said so. I don't think the Court of Appeals has said that yet and I don't think that the argument was in any way improper.

The majority, concerned about the "life and zest" needed to "capture and retain the jury's attention," concludes that "the Constitution does not require prosecutor's to be boring." *Supra,* at 34. Perhaps not, but my concern rests not with permissible theatrics, but rather with permissible comments by the prosecutor—I reiterate the words of this court: "expressions of personal opinion are improper and offend the dignity of the court. They should not be tolerated." *McCowan, supra,* 458 A.2d at 1198.

*3. Improper characterization of the facts*

Throughout this case, the prosecutor endeavored to portray the defendants as participants in an illegal drug organization. Such a trial tactic was permissible to the extent that the evidence and testimony supported this inference. The impropriety arose, however, with the highly prejudicial and inflammatory language that the prosecutor invoked to describe Curtis Irick. In his opening and closing statements, the prosecutor labelled Curtis Irick as "the enforcer." The prejudicial impact of the term was heightened when the government's expert witness used that term to describe the role of an "enforcer" in an illegal drug ring. Defense counsel objected to this language and moved for a mistrial, but the motion was denied and no curative instruction was given.

On direct examination, Dorsey referred to Irick by his nickname, "Dirty Harry." The trial judge warned the prosecutor and the witness to refrain from the use of that term. Despite the trial court's ruling, both the witness and the prosecutor continued to use the term repeatedly thereafter. Specifically, on redirect examination of Dorsey, the prosecutor referred to Irick as "Dirty Harry" eight times. At this point, the trial judge found that counsel for Irick had "opened the door" when defense counsel had asked Dorsey whether she knew the person she identified as Irick by the nickname "Reds." The upshot of this ruling was to hold it was proper for the prosecutor to read a portion of Dorsey's grand jury testimony that referred to Irick as "Dirty Harry" eight times. Finally, during cross examination of Irick, the prosecutor pick up the unloaded gun, which he later described as a "cannon," waved it in the air and "dry fired" it four or five times before the jury. One juror appeared to have a visible reaction to this demonstration. Tr. III 302–03. The defense objected immediately to the prosecutor's conduct, but the motion for mistrial was denied.

Other courts have found improper language and conduct that was much less egregious in quantity, if not quality, than that which was present in this case. *See, e.g., Evans v. United States,* 392 A.2d 1015, 1026 (D.C.1978) (reference to defense witnesses as a gang of felons"); *Maxwell v. United States,* 297 A.2d 771, 773 (D.C. 1972) (reference to defendant as "burglar, thief and robber" was inappropriate), *cert. denied,* 412 U.S. 921, 93 S.Ct. 2740, 37 L.Ed.2d 147 (1973); *United States v. Shelton,* 202 U.S.App.D.C. 54, 56–57, 628 F.2d 54, 56–57 (1980) (improper for a prosecutor to paint a picture "by innuendo" that the defendants were "seedy and sinister characters" through a carefully crafted presentation of the facts which showed that the defendant and one of his principle witnesses were members of the drug underworld involved in all sorts of skulduggery."); *United States v. Jenkins,* 140 U.S.App. 392, 397, 436 F.2d 140, 145 (1970) (defendant called a "teenage hoodlum").

In this case, the jury heard repeated references to the terms "Dirty Harry" and "the enforcer," along with the use of the term "cannon," coupled with inflammatory theatrics with the very same "cannon" in the midst of cross-examination of the al-

leged "enforcer." The inquiry is not, as the majority suggests, whether the fact that "Irick was an 'enforcer' could reasonably be inferred from the evidence." Rather, the appropriate inquiry is the prejudicial effect this term would have on the jury. The same is true concerning the "Dirty Harry" reference. As even the trial judge recognized, " 'Dirty Harry,' in the minds of the jury, is associated with a .44 magnium."

These tactics were highly prejudicial and should not be tolerated. I find the waving and the pulling of the trigger in front of the jury to be especially prejudicial. If, as the prosecutor argued, the jury truly needed to see the operation of the firearm in order to evaluate Irick's testimony (as to whether he panicked or not), then surely the firearms expert who the prosecutor had already called was much better qualified to conduct this sort of demonstration than the prosecutor.

*4. Arguing facts not in evidence*

A critical issue in this trial was whether Curtis Irick knew that Byron Wallace and Jimmy Lewis were police officers. Twice, the prosecutor argued facts not in evidence that went to this critical issue. First, in closing, the government adopted the persona of Jerry Daniels and implied that Jerry Daniels knew that Wallace and Lewis were police officers:

> [Jerry Daniels is] letting him [Curtis Irick] know now's the time Curtis, get 'em off me. *I don't want to go to jail. I don't want to get locked up. I don't want to go to jail for selling dope. They ain't got their guns out then, I'm not going to be caught in the cross fire.* You get them off me.

(Tr. III 570 (emphasis added)). In actuality, Officer Wallace testified that Jerry Daniels stated:

> I recall the statements [by Jerry Daniels] were "Get them, Boo." Boo, Butch, something like that. "Don't let them get me. Shoot them. Don't let them take me." He kept saying it over and over.

Tr. IV, 1539.

Aside from the potential impropriety of adopting the first person, *see Hawthorne v. United States,* 476 A.2d 164, 170 (D.C. 1984), this argument was improper since there was no evidence that Jerry Daniels implied that he knew Lewis and Wallace were police officers. *See Jones, supra,* 512 A.2d at 257.

Second, the prosecutor also argued in closing that Irick was "[r]unning with his business partner. Who knew as Detective Brown told you, that Curtis Irick was out there for one purpose and that's to have a pistol to protect [Irick and Daniels]." Tr. III 574. Support for this comment was completely lacking in the record since the trial judge had *specifically* stricken such testimony by Detective Brown. *See Lewis v. United States,* 541 A.2d 145, 146–47 (D.C.1988) (plain error for prosecutor to argue facts not in evidence and misstate testimony).

*B. Substantial Prejudice Analysis*

Prosecutorial misconduct requires reversal "if the error rises to the level of substantial prejudice." *Hawthorne, supra,* 476 A.2d at 170 (citing *Dent v. United States,* 404 A.2d 165, 172 (D.C.1979). The factors to consider when evaluating the degree of prejudice include: "the gravity of the misconduct, [its] direct relationship to the issue of guilt, the effect of specific corrective instructions by the trial court, if any, and the strength of the government's case." *Hammill,* 498 A.2d 551, 554 (D.C. 1985); *Powell, supra,* 455 A.2d at 411. Where the defendant has preserved objections for appeal, "substantial prejudice" is found when a court determines "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was substantially swayed by the error." *Id.* (citation omitted). Where the defendant has not objected, the record is reviewed for plain error. *Hammill, supra,* 498 A.2d at 554 (citing *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc)).

Review of all of the misconduct in this case leaves no question in my mind that it "substantially swayed" the jury's judgment. Contrary to the majority's implications, most, although not all of the conduct complained of was objected to by defense

counsel.[15] Those comments not objected to would be subject to the stricter standard of plain error review.[16] The misconduct in this case was egregious in nature and repeated in extent. Defense counsel was maligned. Irick, whose testimony was critical to the defense, was labelled a "truthteller," "Dirty Harry," and "the enforcer," who supposededly carried a "cannon," which the prosecutor waved, cocked and dry fired four or five times in front of the jury. The prosecutor argued that Jerry Daniels *knew* that Irick was there to protect him; a fact not in evidence. Furthermore, "the prosecutor's conduct was not an isolated, momentary aberration occurring in the heat of trial," *Villacres v. United States,* 357 A.2d 423, 428 (D.C.1976), it was oft repeated throughout this trial. Consequently, it is highly inappropriate to evaluate incidences in isolation, as does the majority. Rather, we must look to the "cumulative effect" of the prosecutorial misconduct in this case, which I believe unequivocally shows that such conduct resulted in substantial prejudice. *See Mathis, supra,* 513 A.2d at 1349; *Powell, supra,* 455 A.2d at 411. Since Jerry Daniels and Irick were deprived of a fair trial, the Constitution mandates that they be given a new one.

II. *Sufficiency of the evidence—Larry Daniels' appeal*

Larry Daniels was convicted of aiding and abetting Jerry Daniels' possession with intent to distribute cocaine.[17] On appeal, Larry Daniels argues that insufficient evidence existed for conviction of aiding and abetting, because Larry Daniels had no contact with either Jerry Daniels or with narcotics, before, during or after the offense. I agree. Furthermore, even if Larry Daniels had produced cocaine or had a stash of cocaine, this would still constitute insufficient evidence to convict for aiding and abetting the possession by Jerry Daniels.

The majority gives short shrift to the facts surrounding Larry Daniels' actions, and necessarily so, since Daniels' involvement in this case was limited, if he was involved at all. The record does indicate, however, that on the evening of January 9, 1982, Officers Lewis and Wallace entered a playground through a hole in the fence and observed five to eight people standing near a green door of a school next to the playground. Officer Wallace yelled, "Halves, halves, anybody got halves," to which Larry Daniels who stood five feet away responded affirmatively. Wallace asked about the cost and Larry Daniels replied, $50.00. Give me the money." Larry Daniels made no showing of the narcotics and Wallace did not believe that he actually possessed any cocaine. Wallace then looked past Larry Daniels and observed another man standing with two to three

15. Defense counsel objected to the following comments: that defense counsel "slandered" the government (objection overruled at Tr. III 749); that defense counsel were "manipulators of the truth" (objection overruled and request to approach the bench denied at Tr. III 752); that defense counsel "sandbagged" a witness (objection overruled at Tr. III 761, *see also supra* at n. 9); that the government impermissibly vouched for the character of Jimmy Lewis (objection overruled at Tr. III 749); sarcastic references to Irick as a "truthteller" (motion for mistrial denied at Tr. III 605); that Irick fabricated his testimony (motion for mistrial denied at Tr. III 779); improper use of the word "enforcer" (motion for mistrial denied at Tr. IV 751–52, no curative instruction given); improper use of the term "Dirty Harry" (one objection sustained Tr. 1143, 1266; motion for mistrial denied at Tr. 1295–98, no curative instruction given); reading grand jury testimony into record with eight references to Irick as "Dirty Harry" (objection overruled and motion for mistrial denied at Tr. V 83–90); improper use of the term "cannon" and waving and cocking the gun in front of the jury (objection overruled and motion for mistrial denied at Tr. III 302–03); testimony by expert that implied that Daniels would have known whether Irick held a gun (objection sustained and curative instruction given at Tr. IV 1976–80).

16. There was no objection to comments about vouching for the credibility of Dorsey as was there no objection to the two instances of arguing facts not in evidence. *But see Lewis, supra,* 541 A.2d at 146 (plain error for prosecutor to argue facts not in evidence and misstate testimony).

17. Larry Daniels was acquitted of conspiracy to distribute cocaine, two counts of assault on a police officer, two counts of assault with intent to kill while armed and carrying a pistol without a license.

other people, approximately 25 to 30 feet away. Wallace then stated to Daniels, "well, shoot, man, I am going to the man who already has the dope. You might try to steal my money." Both officers left Larry Daniels to approach the persons by the door. Officer Wallace admitted that, "If I gave him [Larry Daniels] the money, it's possible he could have went over there and got it [referring to the people by the green door] or either he could have took my money and went somewhere else. So that's why I didn't arrest him."

Officer Wallace specifically stated that he did not observe Larry Daniels have any contact with Jerry Daniels.[18] After walking towards the group near the school, the officers did not have any further contact with Larry Daniels or see anyone else have contact with him. Later, Larry Daniels was observed by two other officers who were called to the scene. They observed him jumping over a fence by the schoolyard, putting on a jacket, and then "walking kind of fast." When stopped, he did not attempt to evade the police.

The essential elements of aiding and abetting are that 1) an offense was committed by someone; 2) that the accused participated in its commission; and 3) that the accused did so with guilty knowledge. *West v. United States,* 499 A.2d 860, 865 (D.C.1985); *see also Byrd v. United States,* 364 A.2d 1215, 1219 (D.C.1976); *Murchison v. United States,* 486 A.2d 77, 81 (D.C. 1984); *In re R.A.B.,* 399 A.2d 81, 83 (D.C. 1979); *Blango v. United States,* 335 A.2d 230, 235 (D.C.1975). Regarding the element of participation in the commission of the offense, this court has stated further that in order for a conviction of aiding and abetting to stand, there must be proof beyond a reasonable doubt that the accused in some way associated with or participated in the criminal undertaking and that through his or her actions intended to assure its success. *See Wesley v. United States,* 547 A.2d 1022, 1026 (D.C.1988) (quoting *Settles v. United States,* 522 A.2d 348, 357 (D.C.1987)); *In re R.A.B., supra,* 399 A.2d at 83 (citations omitted).

The record before us fails to show the necessary element of association and participation between Larry Daniels and Jerry Daniels to convict Larry Daniels of aiding and abetting. The only evidence of association presented on this record is Larry Daniels' presence on the playground, the expert testimony relating to the role of the "runner" in a drug operation, and the legally repugnant concept of guilt by brotherly association.

Generally, "[m]ere presence at the scene of the crime, without more, is insufficient to prove involvement in the crime." *Settles, supra,* 522 A.2d at 357; *see Creek v. United States,* 324 A.2d 688, 689 (D.C. 1974). When, however, the defendant has participated in the crime through some affirmative act, or if by design encourages, facilitates or stimulates the commission of the crime, the defendant may be convicted of aiding and abetting. (*Willie*) *Miller v. United States,* 479 A.2d 862, 865 (D.C. 1984); *Bailey v. United States,* 135 U.S. App.D.C. 95, 98–99, 416 F.2d 1110, 1113–14 (1969).

This case presents no evidence that Larry Daniels participated in or had any contact whatsoever with Jerry Daniels. No evidence existed that Larry Daniels accompanied Jerry Daniels to the playground, that he talked to Jerry Daniels, or that they made eye contact or signalled each other in any way. The facts merely indicate that Larry Daniels stood alone in a

18. DEFENSE COUNSEL: I am asking, from what you observed that night, not personal experience, not what you think is turned up later, but at that point in time, [while on the playground] *did you see any contact with that man* [i.e., between Larry Daniels and the man observed to be dealing drugs by the green school door]? (emphasis added).

OFFICER WALLACE: Oh, no.

DEFENSE COUNSEL: When you said you were going over there to get stuff from the other man, did [Larry Daniels] ... say "Yeah, go on over there and see my brother. He's got the stuff."

OFFICER WALLACE: No, he didn't say that.

DEFENSE COUNSEL: Did he go on over there and say, "Look, I don't really have the good stuff. He does, and I'm working for him."

OFFICER WALLACE: No, sir, he didn't say that either. (T. 1580–81) (emphasis added).

schoolyard along with at least five to eight persons who were also present on the playground. When the undercover officers approached Larry Daniels, he responded to their request for cocaine by asking for money, but he did nothing else to indicate that he would actually supply the drugs, or indicate who the supplier would be. Officer Wallace did not give Larry Daniels money, nor did he believe that Daniels possessed drugs. The officers left Larry Daniels to apprehend Jerry Daniels, who was standing 25–30 feet away, apparently engaged in a drug transaction with two to three others. Finally, Larry Daniels left the playground alone after the shootings, as did the other people in the schoolyard.

The government argues, based on the expert testimony of Detective Brown, that Larry Daniels' actions in negotiating a purchase price was consistent with a "runner" —someone who negotiates the price for a purchaser, and obtains for the purchaser either the drug or someone who has the drug—in this case Jerry Daniels. Brown testified also, however, that if someone negotiates for drug purchase money, *unless contact among the person can be observed* it is impossible to tell whether the person is working with anyone or with whom the person is working:

> DEFENSE COUNSEL: Detective Brown, in your experience, in these high crime neighborhoods, these high drug areas, there are—lots of people hang around; has that been your experience?
>
> BROWN: Generally, yes.
>
> DEFENSE COUNSEL: *And unless you make certain observations of contact between one or the other, I mean you really can't tell whether or not they are involved with another; is that right?*
>
> BROWN: That is correct.

(T. II. 37–38 (emphasis added). Here, Officer Wallace specifically stated that he observed no contact between Larry Daniels and Jerry Daniels. *See supra,* note 16. Rather, he merely observed five to eight people milling around a darkened playground near a school building from which Larry Daniels stood 25 to 30 feet away. Officer Brown also stated that often persons who act as Larry Daniels did, really have no intention of selling drugs. Rather, they falsely claim to have a stash of drugs in another location, take the money up front and then disappear with it. Thus, Larry Daniels may have been simply trying to rob Officer Wallace, a possibility that Wallace acknowledged. The alternative argument—assuming that Larry Daniels was going to fulfill the request for drugs—requires pure speculation since no contact of any sort was shown to have taken place between him and the others. Absence of evidence linking the accused to Jerry Daniels cannot be surmounted by hypotheses. *Quarles v. United States,* 308 A.2d 773, 775 (D.C.1973).

Further, I can find no support for the proposition that expert testimony describing the *modus operandi* of potential crime scenarios, without further evidence to *prove* that the defendant in fact engaged in the events testified about, would constitute sufficient proof to convict for aiding and abetting. To the contrary, in *Quarles, supra,* 308 A.2d at 775, this court reversed a conviction for aiding and abetting a pickpocket despite expert testimony that supported the events testified to at trial.

In *Quarles,* the appellant pushed between a husband and a wife when they were boarding a bus. Once aboard, appellant, who was standing near the couple, bent over and forcibly pushed the husband, while at the same moment an unknown gentleman pushed against the husband from the rear. The husband immediately felt for his wallet and noticed it was gone. In reversing the conviction, this court stated, "[t]here was no testimony of any communication between appellant and the purported thief at any time before or after the theft, nor were they ever seen together before or connected in any other way." *Id.* The court concluded that:

> while surmise and conjecture, particularly in light of the expert testimony as to the *modus operandi* of pickpockets working in pairs, may lead one to suspect that the two men may have been acting in concert, suspicion, even strong suspicion is no substitute for probative evidence of guilt.

*Id.* (footnote and citation omitted).

Thus, without evidence of any contact between Larry Daniels and Jerry Daniels,

or any evidence to show that Larry Daniels was a runner consistent with the expert's theory, we are left with nothing more than the fact that Larry Daniels and Jerry Daniels are brothers.

The majority warns: "guilt by association is a very dangerous principle ... fraught with peril"—words devoid of meaning if not applied. Our legal system has consistently eschewed the notion of guilt by association in the context of articulable suspicion for arrest where propinquity could not form the basis to presume concerted criminal conduct; [19] not surprisingly, I have found no exception for association based on blood.[20]

### III. *Conclusion*

I would reverse this case as to Larry Daniels, finding insufficient evidence of aiding and abetting. I would reverse and remand this case for a new trial based on prosecutorial misconduct that substantially prejudiced this trial for Jerry Daniels and Curtis Irick.

**19.** *Smith v. United States,* 558 A.2d 312 (D.C. 1989) (en banc).

**20.** Further, I am satisfied that the prosecutorial misconduct discussed earlier which was specifi-
cally directed at Jerry Daniels and Irick, spilled over and affected the verdict as to Larry Daniels.